August 22.
JUDGE CARR.
After stating the case, he proceeded :
The Court instruct the Jttry, that the slave Sarah was not included in the schedule. By this I understand the Judge to mean, (not that Sarah was not one of the eight slaves which the schedule mentions as having been given to Long’s children, this being a question for the Jury exclusively,) but I presume he intended to say, that the insolvent, in his schedule, disclaiming all title to these eight slaves, Sarah, as one of them, could not be claimed by the Sheriff, in virtue of the schedule.
T do not consider the Sheriff as claiming under the schedule at all, hut undertheLaw. That vests in him all the estate of the prisoner, as well that left out of the schedule, as that included in it. The schedule was necessary to bind the insolvent, for he swears it contains all his estate of every kind : it was proper, also, as a guide to the Sheriff, because the prisoner must be supposed to know best, what and where his property was : but the schedule neither gave to the Sheriff any right to the property it contained, nor limited his rights to its contents. Immediately on the insolvent’s taking the oath, the Law divests him of everything but his necessary apparel, and utensils of trade, and casts upon the Sheriff, all his estate, rights, and interests. This has been the Law ever since 1769. 8 Hen. Stat. 326. Nor was there at any time before January 4th, 1799, any Statute requiring the prisoner to deliver up the personal, or convey the real, estate. An inconvenience *arose, however, from the difficulty the Sheriff sometimes encountered, in finding and getting into his actual possession, the ’pera01131 property ; and to remedy this, a section was added to the Execution Law, in the Session of 1798-9, saying, that all the personal estate contained in the schedule, shall be transferred and delivered by the debtor, and all the real estate conveyed to the Sheriff, under the direction of the Court, or persons administering the oath, before such insolvent debt- or shall be discharged. Why the conveyance of the real estate was required, it is difficult to imagine ; for the Law had already completely conveyed it: the title was of record, and the land could not be removed. It certainly was not its purpose, or effect, to narrow the operation of the Law, which vests in the Sheriff, “all the estate which shall be *892 contained in such schedule; and any other estate which may be discovered to belong to the prisoner. ’ ’ These ' are the very words which have been in every Revisal from 1769 to the present day. The section introduced in the Session of 1798-9, I consider as merely directory to the Court, or Magistrates, before whom the oath is taken. And though the prisoner should be released without delivering up an atom of his personal goods, or conveying a foot of his land, the whole of both would be completely vested in the Sheriff. The Court, then, in deciding that the slave Sarah was not included in the schedule, settled a question of no moment in the cause. But the Court further instructed the Jury, that the Plaintiff acquired no right or title to Sarah, by the Deed from the Sheriff to the Plaintiff, and refused to admit evidence to prove that she was actually sold among the other property, being of opinion, that not being in the schedule, she could only pass from the Sheriff to the purchaser by Deed,, and that the Deed aforesaid did not pass her. In my mind, her being in or out of ' the schedule, cannot make a Deed more or less nec'essary to pass the Sheriff’s right and title to the purchaser. However this may be, the Plaintiff claims under the Deed alone, and by that he must stand or fall.
*In considering whether Sarah passed to the Plaintiff by the Sheriff’s Deed, we must take these facts for granted : 1st: That Sarah is one of the eight slaves whom the Defendant, in his schedule says he had given to his children by conveyance, older than the claims of his creditors 2d. That she had continued in his possession, and was used as his own property up to the bringing this suit; 3d. That Sarah was actually sold by the Sheriff to the Plaintiff, according to the forms of the Act of Assembly. ^ It is proper to take these facts as proved in testing the correctness of the Court’s opinion ; because, being matters for the jury, if the proof of them to the Jury’s satisfaction, would have rendered the opinion improper, it ought not to have' been given. If the Deed of the Sheriff did not pass to. the Plaintiff, any title in the slave Sarah, it must be either, 1st. Because he had no title to pass; or, 2d. Because the Deed was not sufficient in Daw to pass his title.
1st. As to the Sheriff’s title. “All the estate which shall be contained in such schedule, and any other estate which may be discovered to belong to the prisoner, for such interest therein as such prisoner hath, and may lawfully depart withal, shall be vested in the Sheriff of the County wherein such lands, tenements, goods and chattels shall lie, or be found.” Does this Act vest in the Sheriff, title to a slave which the prisoner states in his schedule that he has given to a child by Deed, but which Deed has never been recorded, and the possession of which slave has always remained with the donor? Now we know, that both by the Act of 1787, ch. 22, concerning gifts of slaves, and by the Statute of Frauds, such a gift would be void : but it is said, that the estate of the prisoner vests in the Sheriff only for. such interest therein as such prisoner hath, and may lawfully depart withal, and that these words do not comprehend an interest like .this, claimed by another under a Deed from the prisoner, and disclaimed by the prisoner .himself. If this be so, it must strike every one, that there is a glaring defect in this Daw. The insolvent *debtor is in •that very situation which holds out the strongest temptations to make a fraudulent disposition of his property, upon secret trust, to friends or children : the Daw comes in to the aid of creditors, takes from the prisoner all his property, rights and interests, and vests them "for the creditors in the Sheriff, makes him the Trustee of the creditors, the only medium through which they can vindicate their rights, or question the veracity of the prisoner’s oath ; and yet this Trustee, has no power vested in him to claim, for the creditors, property fraudulently given away, or colorably disposed of by the prisoner, provided he disclaims in his schedule any interest in such property, and another claims it !
The resemblance, which the Sheriff’s character, in cases of insolvency, bears to that of assignees, in bankruptcy, naturally turns our attention to those Daws, and we were re-fered to them in the argument, as containing language similar to that of our Statute. In Cook’s and Cooper’s “Bankrupt Daws,” these Acts are set out at large. In 34 and 35 H. 8, (the oldest Statute of Bankrupts, and said to be the foundation of all the rest.) we have, first, a statement of the mischiefs to be removed, then the Act declares, that the Dord Chancellor, (and others named,) upon complaint made in' writing, shall have power and authority, to take by their wisdoms and discretion, such orders, &c., as well with the bodies of such offenders, &c., as also with their lands, tenements, fees, annuities, and offices, which they have in fee simple, fee tail, term of life, term of years, or in right of their wives, as much of the interest, right and title of the same offender shall extend, or be, and may then lawfully be departed with, by the said offender : and also with their money, goods, chattels, wares, merchandizes, and debts, wheresoever they may be found or known. And to cause their said lands, &c., goods, &c., to besearched, viewed, rented and appraised, and to make sale of the said lands, tenements, fees, annuities, and offices, as much as the same offender may then lawfully *give, grant, or depart with ; or otherwise, to order the same, for true satisfaction, and payment of the said "creditors. The Statute 13th Eliz. ch. 7th, after enumerating those which shall be considered acts of bankruptcy, empowers the Chancellor, or Keeper, to appoint Commissioners, upon any complaint made, &c., who-shall have power, &c., to take, order, &c., with the bodies of such bankrupts', &c., as also with all his or her lands, tenements, hereditaments, as well copy, or customary hold, as free-hold, which he or she shall have in his or her own right, before he or she became bankrupt, and also with all such lands, tenements, and heredit-aments. as such person shall have purchased or obtained for money, or other recompence, jointly with his wife, children or child, to the only use of such offender, or offenders, or of, or for such use, interest, right or title, as such offender then shall have in the same, *893 which he may lawfully depart withal, &c. And also with his money, goods, chattels, wares, merchandises and debts, wheresoever they may be found, or known, &c. In these Statutes, we find the very words which have been introduced into our Insolvent haws, for such interest therein as such prisoner hath, and may lawfully depart withal: and we find them applied solely to real estate, intended to describe those lesser estates, and partial interests, which a man may hold in lands and tenements, either by himself, or jointly with others : to goods and chattels they are not applied in the slightest degree ; nor indeed could they, for in that day there was no such partial interest in personal estate known to the Law : passing the title for an hour, passed it for ever.
If we look into our early Insolvent Laws, we find it equally clear, that these words were intended to apply to real estate exclusively. Thus, in the Act of 1726, (Hen. Stat. vol. 4, 166,) sec. 31, it is enacted, “That all the lands, tenements and hereditaments, which shall be contained in such schedule, for such use, interest, right or title, as such prisoner then shall have in the same, * which he or she may lawfully depart withal; and also, all goods and chattels whatsoever, in such schedule also contained, shall be vested in the Sheriff of the County,” &c. The words here, can only be applied to real estate. The same words áre repeated in the Law of 1748, and again in a Bankrupt Law, passed in November, 1762, but repealed in May, 1763, before it had gone into operation. In the subsequent Revisáis, instead of keeping the subject of real and personal estate separate, they are blended into one sentence; (“all the estate, &c.”) and the words “for such interest therein, as such prisoner hath and may lawfully depart withal,” are so used, as to render it doubtful at first view, whether they do not apply as well to personal, as to real estate : but when we consider, that the words are taken literally from the Bankrupt Laws ; that in our Laws, they were used in exactly the same sense ; that as applied to real estate, they have a clear meaning, and an effect in accordance with justice, and the other enactments of the Law ; but, that if we understand them as applicable to personalty and say that wherever the debtor has made a fraudulent disposition of goods, which would bind him, it shall bind the Sheriff, and consequently the creditors, we make the Law defeat its own purposes, and commit rank injustice. When we look at these consequences, I think we are bound to conclude, that no change in the application of the words was intended ; but, that this blending of the two subjects, has proceeded from inattention, added to that desire to condense, so visible in our Revisal; and which, in other instances, is carried so far, as to sacrifice, in some degree, clearness to brevity. This renders it often necessary to the understanding of a Law, that we should look back to its origin, and trace its progress; and for this purpose, the Statutes at Large by Hening, are invaluable. I consider these words, then, as applying only to real estate, and meaning to say, that the same quantity of estate, which the insolvent possessed in his own right, shall vest in the Sheriff for the creditors. As to the personalty, I *oonsider the Statute as vesting in the Sheriff, for the benefit of the creditors, all the rights, interests and property of the insolvent. . In this respect, the Sheriff, I think, occupies a station, and performs functions a good deal like those of assignees of bankrupts, and the English Cases might be referred to. I believe, however, there are not many that turn on the power of assignees to set aside fraudulent conveyances made by bankrupts ; for, one of their early Statutes declared a fraudulent conveyance to be itself an act of bankruptcy, which of course would overreach and avoid the conveyance. In Anderson v. Maltby, 2 Ves. jr. 244, the Lord Chancellor says, “The assignees have all the equity the creditors have, and may impeach transactions which the bankrupt himself would be stopped from impeaching.” This applies equally to the Sheriff : indeed, the doctrine seems to me to stand on the plainest principles of reason, law, and justice. The Sheriff is interposed by the Law, to receive, secure and distribute, among the proper creditors, all the estate of the insolvent. He represents both the insolvent and the creditors. Would it not be strange, then, to say, that if the insolvent were to convey away half his property, and this most manifestly fraudulent, this curator and trustee, could do nothing, bring no suit, take no step to recover this, and bring it into a division among the creditors? He is a poor representative, if this be so, and the Law has done little in raising him up to protect the interests of the creditors. They could have taken much better care of themselves. I consider it clear Law, then, that under the Act of Assembly, the Sheriff is vested with all the property and rights of the insolvent; and that as representing the creditors, and possessing their legal and equitable rights, he may set aside fraudulent conveyances of the insolvent, and recover the property.
But it may be said, that even supposing the Sheriff has this right, he has not pursued it properly in this case: instead of suing to set aside the fraudulent gift, he has at *once sold the slave. The same section which vests in the Sheriff all the estate of the insolvent, proceeds to say, “and such Sheriff is hereby authorised, empowered and required, within sixty days after the taking the said oath, ten days previous notice of the time and place of sale being given, to sell and convey the same to any person or persons whatsoever, for the best price that can be got for the same.” It is said, however, that this sale is meant to embrace property only which is surrendered to the Sheriff, and to which there is no dispute: and that this is proved by the next section, which enacts, that when the debtor is discharged, and the schedule contains articles of money or tobacco, due to such prisoner, or goods, chattels or estates, belonging to him, in the possession of another, in that case the Clerk may, at the instance of the creditor issue a summons against each of the persons named as debtors, or who have possession of any goods, chattels or estates of the property of the prisoner, &c., going on to direct the manner of proceeding in such cases. There is another section, which gives the prisoner, in a certain case, the right to proceed *894 against the garnishee, and another gives the right to any creditor, but I understand that all these proceedings must be in the name of the Sheriff, in whom all the. rights and estate of the debtor are vested. As to the proceedings contemplated by these sections, against garnishees, it is clear to me, that the case before us does not come within them. They speak of property, which, by the schedule, the debtor claims, and states to be in the possession of another : here, the schedule disclaims all title to the slave, and she is not in the possession of another, but of the debtor himself. The Statute never meant that the Sheriff should issue a summons against the debtor himself, as garnishee, for property in his own possession. Of all such property, I have no doubt, the Sheriff might take possession, without any process. But has the Sheriff in such case, a right to sell such property, at the general sale of the insolvent’s effects? The schedule says, the *debtor has given her to his child ; but she has remained in his possession : the Sheriff finds her there : the Law says such a gift passes no interest: if so, the property was in the insolvent, and the Law has cast it upon the Sheriff. What shall he do with her? Give her up to the child, and then sue for her, or hold her till the child may choose to sue him ? X incline to- think that the Sheriff would violate no duty, in selling such slave with the rest of the debtor’s property. But, suppose that in selling her, while the claim hung over her, and she was not in his actual possession, the Sheriff violated the spirit and meaning of the Law, still I think that his sale and conveyance of her would transfer his title to the purchaser, if the Deed were sufficient in Law. I think so, because I consider the Sheriff completely clothed with the legal title ; as much so as any Trustee whatever : and having the legal title, his Deed would convey it, though in doing so he violated his trust.
But, the question still remains — Is the Deed of the Sheriff sufficient in Law to convey the title of this slave to the Plaintiff ? That such was the intention of the Deed, is expressed too clearly for doubt. If the intention be not effected, it must be because the description of the property is too uncertain. The Deed conveys “all the right, title and interest vested in the Sheriff, by the Act of Assembly for relief of insolvent debtors, both in Law and Equity, of, in, or to, eight negroes conveyed by Long to his children. The negroes here, are not named, to be sure ; but, a name is only one kind of description, and any other which enables the parties to identify the property, will do. Long, in his schedule, says, there were eight negroes which he had given to his children, their names in the writing; the Deed of the Sheriff follows this description. Now, proof that this slave Sarah, is one of those given to the children, identifies her at once. The writing by which Long states that he conveyed the slaves, and in which they are named, is not produced, though it behoved the Defendant to have produced it, and he had notice to do so; but, he himself supplied *evideuce, by two or three, that they had often heard him declare, that he had given Sarah to his daughter Joanna; thus showing that she was one of the eight. This, however, was a question for the Jury. Upon the reason of the thing, I have no doubt that the description is certain enough to pass the property : the Law of the case is as clear as the reason. If a man bargain and sell all his land in D., the land will pass with all houses, woods, &c. 4 Co. 87, b.; Cro. Eliz. 476; 2 Roll’s Abr. 49, 57 ; Owen, 75 ; Noy, 49 ; Cro. Eliz. 905 ; Perkins, 114. A mortgage of “all the lands, tenements and hereditaments to me belonging in the province of New-York,” held to be good. Jackson v. De Lancey, 11 Johns. Rep. 365. Same Case, in Error, 13 Johns. 537. This Court has also decided the same principle in a case not long since. I think, therefore, that the instruction of the Court was wrong ; that the Judgment must be reversed, and the cause sent back for a new trial, on which no such instructions are to be given.
JUDGE GREEN.
After a full statement, proceeded :
The Plaintiff rested his title upon these grounds : That Sarah was one of the slaves mentioned in the schedule and deed, under thé description of eight slaves conveyed by Long to his four eldest children : that Long was in possession of the slave when he gave in his schedule, and continued in possession until after the suit brought: that the conveyance of the slave by Long to his daughter, Joanna, was fraudulent and void as to creditors, under the Statute of Erauds: that the legal title to the slave, whether she were contained in the schedule, or not, was vested by Law in the Sheriff: that the Sheriff sold and conveyed that legal title to him: and that the title passed effectually by the Deed to the Plaintiff. The Deed in terms conveys all the right, title and interest, vested in the Sheriff by the Act of Assembly, for the relief of insolvent *debtors, in and to the eight slaves conveyed to his children by Long, and mentioned as so conveyed in his schedule. The Deed from Long to the Sheriff, professed only to convey the lands, and not any of the personal property mentioned in the schedule ; and under that Deed, the Sheriff did not profess to claim title to any of the personal property mentioned in the schedule. The intent of the Sheriff’s Deed to pass these negroes, if he had any right in him, is clear ; and that the title to them would pass by the Deed, is equally clear, if the Sheriff had any title which he could transfer in this way to another, unless the Deed were void, as to these negroes, for uncertainty in the description of them. A conveyance of all my slaves, in such a County, or on such a plantation, or which are claimed under a Deed by such an one, or in the possession of such an one, or all my furniture, or plantation utensils, would be good. In all these cases, parol proofs must be resorted to, for the purpose of showing the identity of the property intended to be conveyed, and that being ascertained, the Deed would operate upon it. In a late case, it was decided here, that a Deed conveying property specified by particular names and description, and also, all the grantor’s estate, passed his equitable right to a slave then in the adverse possession of another, and not named in the Deed. The *895 Deed under consideration, is not so vague and uncertain in the description of the property intended to he conveyed, as that was, nor more so than in the cases above supposed. Proof that the slave in question was one of those conveyed by Long to his four eider children, and mentioned in his schedule, at once identified the property intended to be conveyed. Whether the proof offered on this point, was or was not sufficient to identify the property, was exclusively for the consideration of the Jury ; and the opinion of the Court must be taken to be, that even if the property claimed was identified to be that intended to be conveyed, the Deed did not convey any title to it.
*If the Sheriff had title to the property in question, and it was embraced in the Deed, the title passed to the Plaintiff, unless the Sheriff was disabled by the Statute from transferring any title, vested in him, to property under the circumstances in which this was placed, that is to say, to property not in the possession of the Sheriff, but in that of the insolvent debtor, and claimed by another as belonging to him.
The Statute directí, “that before taking the oath prescribed, the prisoner shall subscribe, and deliver a schedule of his whole estate, and shall, before he shall he discharged, transfer and deliver, all the personal estate contain ed in the schedule, to the Sheriff ■of the County where it may lie or be found. And all the estate which shall be contained in such schedule, and any other estate which may be discovered to belong to the prisoner, for such interest therein as such prisoner hath, and may lawfully depart withal, shall be vested in the Sheriff of the County wherein such lands, tenements, goods or chattels, shall lie, or be found : and such Sheriff is hereby authorised, empowered, and required, within sixty days after taking the oath, ten days notice being given, to sell and convey the same to any person or persons whatsoever, for the best price that can be got for the same.”
The Act further provides, that if the schedule contains any articles of money, or tobacco, due to the prisoner, or goods, chattels, or estates, belonging to him, in the possession of any other, the creditor may proceed upon summons against the garnishee, in the name of the Sheriff, for the recovery thereof, and the garnishee shall be called upon for a discovery on oath, and if Judgment is obtained against the garnishee, the Sheriff may levy the execution, and dispose of the money, or tobacco, or goods, chattels, and estate, so recovered, in the same manner as the estate contained in the schedule is thereby directed to be disposed of.
Another clause of the Statute provides, that if the garnishee, on oath, denies the claim made upon him, in whole, *or in part, the Sheriff or prisoner may claim the residue against the garnishee, by legal process : And another clause authorises any of the creditors to proceed against the garnishee.
This Statute is very inaccurately penned, but upon the whole Statute, the fair construction is, that the prisoner, or creditor, proceeding against the garnishee under the two last clauses above cited, must proceed in the name of the Sheriff, in whom the former provisions of the Statute, had vested all the interest of the prisoner (which was within the operation of the Statute,) in all property, whether it was embraced in the schedule or not, or whether it was in the possession of the prisoner, or in that of some other person claiming under him, or adversely to him. The Statute could not have intended to give to the Sheriff, the prisoner, and creditor, a concurrent right to sue for the same thing, at the same time. Besides, the fund when recovered, was to be disposed of by the Sheriff, as directed by the Act, in paying the creditors at whose instance the debtor was in custody.
The Act requires the prisoner to deliver a schedule of his whole estate, and to swear that it does contain his whole estate. The prescribed oath is in very detailed terms, to show that it contains all valuable interests, legal and equitable, of all possible descriptions. The clause, directing that before he is discharged, the prisoner shall transfer and deliver the personal estate contained in the schedule, and convey the real estate therein, has not the effect of dispensing with the obligation on the prisoner, to put into his schedule, property (belongingto him, or in which he has an interest,) in the possession of others, whether adversely, or not, or property which he cannot, for any cause, deliver. If it did, then, as to all which he could not deliver, and therefore, did not put into the schedule, he would be required to swear falsely ; and the Act supposes, that property in the schedule may not be delivered, or be capable of delivery, and prescribes the means *of getting possession of such property, after the discharge of the prisoner. The true construction of this provision is, that it is directory to the Court, or Magistrates, who act in discharging the prisoner, that they shall be required to transfer and delivery of all, which it appears to them, ought to be, and can be transferred and delivered before the discharge. The failure of the party to put into his schedule property in which he has an interest, whether in his possession, or in that of another, and the failure of the Court, or Justices, to require the previous delivery of all that can be delivered, cannot impair the effect of the Law, which vests in the Sheriff all such interest, whether the property be contained in the schedule, or not, or be in the possession of the prisoner, or some other holding adversely to him.
If, therefore, Long had any interest in this property, which was at all subject to the operation of the Statute, it vested in the Sheriff, and the question is, whether his Deed passed that right to the purchaser under the circumstances which appeared. Although the Statute in terms directs the Sheriff, within sixty days, to sell, at public sale, all the interest vested in him by Law, whether the property is in the schedule, or not, or whether it be in his, or the prisoner’s possession, or in that of some other, (and upon the idea that this was the effect of the Law, the Sheriff appears to have acted in this case,) yet I think, upon the whole Law taken together, the fair meaning of it is, that the Sheriff shall sell all that is delivered, or otherwise comes to his possession, and *896 not that which, although contained in the schedule, is in the possession of others than the insolvent. The directions of the Statute, as to the mode of recovering and disposing, after recovery, of property so situated, leads to this construction. Whether the slave in question was, or was not embraced in the schedule, she did not come within the terms of that clause, which directs the mode of proceeding against a garnishee, having possession of property claimed by the insolvent in *his schedule. The slave was in the possession of the prisoner, and not of his daughter, and there was no person against whom the Sheriff- could sue out a summons, or bring an action, but Long himself. The Law could hardly have inter ded to put the Sheriff, in any case, to the necessity of suing the insolvent for the property in his possession, whether put into the schedule, or not. He might have lawfully taken possession of this property, if any title to it vested by Law in him. If he had taken possession of her, it would perhaps have been inconsistent with the spirit of the Law, to have sold her ■ whilst ■ Long’s interest, which was to be sold, was uncertain and disputed. I do not' mean to give any opinion, whether if the Sheriff had any interest in this property, so situated, he would have been-acting properly, or improperly, in selling that interest as ■ he did, whether he had reduced the property to his possession, or not. But, admitting, that in making such sale, he acted against the terms or spirit of the Statute, then the question occurs, whether his sale and conveyance would be utterly void, and not pass his title. I do not think it would be void. In the case of a public officer empowered to sell the property of another, he has no general property in the subject. The general property remains in the owner until it is divested by a sale and conveyance of the property in the regular mode prescribed by Law ; and if the officer is in possession of the property before the sale, he has only a special property, for special purposes, as any other bailee: he has only an authority, to the valid exercise of which, a strict pursuance of the terms of his authority must be shown. If he has not conformed to those terms, he has acted without authority, and his act is not binding or valid. Thus, in a sale for taxes, by a public officer, no title passes, unless it is shown that he pursued the direction of the Law, for he had no title to pass, and was only authorised to pass the title of another, in a prescribed way. But, in the case at Bar, the legal title vested in the Sheriff, according to the express terms of the Statute, (if, indeed, he had any interest *or power whatever in or over the property,) and his conveyance transfers the title, as the conveyance of any other Trustee passes the legal title, no matter how directly he may have acted against the purposes or directions of the Trust. This is fully settled by the decisions of this Court, not on the ground that the Trustee is presumed to have acted according to the terms, of his trust, but (even if he had acted directly against' them, and if that appeared on the face of the Deed,) because the Deed of him who has the legal title, necessarily carries that legal title to the grantee. The terms of the Act, in re-1 lation to the disposition of the insolvent’s property, are directory to the Sheriff. If he violates his duty, disregarding those directions, the sale is not, therefore, void, in point of Law, as to the purchaser. But, he is responsible, as any other Trustee, to the parties interested in damages, or, if the circumstances justified it, a Court of Equity would hold the purchases to be a Trustee, standing in the shoes of the Sheriff.
I think, therefore, that if the slave in question was identified as one intended to be conveyed, (a question for the Jury,) that the title of the Sheriff, if he had any, passed to the purchaser. Whether the Sheriff had any title, depends upon the question, whether personal property given to another, by Deed, not recorded, and the possession remaining with the donor, passes to the Sheriff, upon the donor’s taking the oath of an insolvent debtor. This I consider as the serious question in the cause. This depends-upon the construction of the terms of the Statute, which provides that “all the estate which shall be contained in such schedule, and any other estate which shall be discovered to belong to the prisoner, for such interest therein as such prisoner hath, and may lawfully depart withal, shall be .vested in the Sheriff,” &c. The doubt arises upon these expressions, for such interest therein as such prisoner hath, and may lawfully depart withal. A fraudulent conveyance is good between the parties, and is not avoided as to purchasers, by the Statute of the 13th *of Elizabeth, which avoids such only, as to creditors : nor, if of personal property, by the 27th of Eliz. which avoids only such conveyances of real property, in respect to purchasers alone ; a distinction carefully preserved in our Statute of Frauds ; the consequence of which is, that “if a man that is a debtor make a deed of gift of all his goods, to protect the taking of them in execution for his debts, this deed of gift is void against those to whom he was indebted, but against himself, his own executors or administrators, or any man to-whom he shall after sell or convey them, it is good. Bacon’s Use of the Law, 62. But, such a conveyance might be void as to a subsequent purchaser, at Common Law, under circumstances, as if the donor remained in possession, and afterwards sold to a purchaser without notice, as was the case of Williamson v. Farley, Gil. Rep. 15.
The expression under consideration, was taken from the Statute .of Bankrupts in England, but in rather a different context. The first Act relating to bankrupts in England, 34 and 35 H. 8th ch. 4, authorises the-Lord Chancellor, and other Officers, or any three of them, in case of bankruptcy, to take such orders, and directions, as they may think proper, in their discretions, with the bodies of the bankrupts, “and with their lands, tenements, fees, annuities, and offices, which they have in fee simple, fee-tail, term of life, term of years, or in right of their wives, as much as the interest, right, andt title of the' same offender shall extend or be,’ and may then lawfully be departed with, by the said offender, and also with their money, goods, chattels, wares, merchandises, and debts whatsoever. And to cause their said lands, tenements, fees, annuities, offices, *897 goods, chattels, wares, merchandises, and debts, to be searched, viewed, rented, and appraised, and to make sale of the said lands, tenements, fees, annuities, and offices, as much as the same offender may then lawfully give, grant, or depart with, or otherwise to order the same, for true satisfaction and payment of the creditors, ” *&c. The Act of 13th Eliz. ch. 7, provided that the Commissioners of Bankruptcy might take order and direction at their discretion, with the body of the bankrupt, “and also with all his lands, tenements, and hereditaments, as well copy or customary hold, as freehold, which he shall have in his own right, before he became bankrupt, and also with all such lands, tenements, and hereditaments, as such person shall have purchased, or obtained, for money or other recompense, jointly with his wife, children, or child, to the only use of such offender, or of or for such use, interest, right, or title, as such offender then shall have in the same, which he may lawfully depart withal, or with any person or persons of trust, to any secret use of such offender, and also with his money, goods, chattels, wares merchandises, and debts, and cause the said lands, tenements, fees, annuities, offices, goods, chattels, wares, merchandises, and debts, to be searched, viewed, rented, and appraised to the best value they may, and to make sale of the said lands, tenements, and hereditaments, and all deeds, writings, and evidences, touching the same, and also of all fees, annuities, offices, goods and chattels or otherwise order the same, for true satisfaction and payment of such creditors,” &c.
The Statute of 1st James 1st, ch. 15, declared that the making of any fraudulent grant, or conveyance of lands, tenements, goods, or chattels, to the intent, &c. whereby his creditors shall, or may be defeated, or delayed for the recovery of their just and true debts, should be an act of bankruptcy; and that a conveyance made, or procured to be made by any, who should become bankrupt, to any of his children, or any other person, of any manors, lands, tenements, heredita-ments, offices, fees, annuities, leases, goods and chattels ; or to transfer his debts into other men’s names; except the same be purchased, conveyed, or transferred for or upon marriage of any of his children, both the parties married, being of years of consent, or for some valuable consideration, the same might be conveyed by the Commissioners.
*Itis obvious that the expressions of these Statutes, in respect to the interests belonging to the bankrupt, and which he might lawfully depart withal, referred only to such partial interests which might be held in lands, tenements, hereditaments, fees, annuities, and office, in all of which there might be particular interests, as for life, in tail, for years, tenancy by the cur-tesy, and dower; and these words were introduced for the purpose of limiting the power of the Commissioners to any such partial interest which might belong to the bankrupt: accordingly they could not dispose of any thing more in land, in which he had an estate tail, than the bankrupt held, until by the 21st of Jas. 1st, ch. 19, sec. 12, the Commissioners were authorised to convey entailed lands in fee. Those words did not, in the terms of the Statutes, taken literally, apply to money, goods, chattels, wares, merchandises and debts. In these personal subjects, as the Law was then held, there could be no such partial interests, the gift of such for a time, being a gift forever. The disermination made by the Statutes in the application of those terms, to real, and not to personal property, proves that the Legislature had in contemplation to provide, by the use of that expression, only for the case of partial interests, and not for that of property fraudulently conveyed, whether the conveyance was avoided by the Common Law, or by the Ancient Statutes of 3 H. 7 ch. 4, as to fraudulent Deeds of Gift of goods, and 50 Ed. 3, ch. 6, as to fraudulent assurances of lands or goods. The Statute of the 13th of Eliz. ch. 5, and of the 27th of Eliz. respecting conveyances to defraud creditors and purchasers, had no existence when the first Statute of Bankrupts was passed, and the first of them was passed at the same time as the Statute of Bankrupts of the 13th of Elizabeth.
Our Act of May, 1726, ch. 3, sec. 30-31, for the relief of insolvent debtors, after prescribing the schedule to be subscribed, and the oath to be taken by the insolvent, declares, “that all the tenements, and hereditaments, which *shall be contained in such schedule for such use, interest, right, or title, as such prisoner then shall have in the same, which he may lawfully depart withal, and also all goods and chattels, whatsoever, in such schedule also contained, shall be vested in the Sheriff;” thus adopting the precise expressions of the Statutes of H. 8, and of Eliz. of Bankrupts, and using the words, for such use, interest, right and title, as such prisoner then shall have in the same, which he may lawfully depart withal, in the same context, and to the same purpose as in the English Statutes in reference to the partial interests which the prisoner might then have in real property, and to that only.
In November, 1762, ch. 8, an Act of Bankruptcy was passed, which retained the same words, for the same purpose; “and thereupon all lands, tenements, and hereditaments, in such schedule contained, for such use, interest, right or title, as such debtor shall have in the same, which he may lawfully depart withal, or dispose of, and all siaves, goods, and chattels whatsoever, in such schedule contained, and also all outstanding debts, and all the estate real and personal, of such debtor, in possession, reversion, or remainder, and all his effects whatsoever, at the time of executing such schedule, though not contained therein, shall be vested in the assignees,” &c. This Act, for the first time, directed the property not contained in the schedule to be vested in the assignees. This Act, which was temporary, did not repeal the Act for the relief of insolvent debtors then in force, and which was re-enacted in November, 1769, ch. 3, sec. 7, 8, 9, and the provision of the Act of 1762, in respect to property not contained in the schedule, was adopted from that Act. In this Act of 1769, the provision for vesting the prisoner’s property in the *898 Sheriff was in the very words of the Act now in force, and has continued so in all the subsequent Revisáis of the Laws.
From this re-view of the Laws for the relief of insolvent debtors, compared with the Statutes of Bankrupts, from *which they were in part taken, it is clear, that the Act of 1726, re-enacted in 1748, and of 1769, referred only to the extent of the interest in the debtor, in the real property, in respect to the quantum of his estate, and not to the question, whether property, fraudulently transferred by the debtor, in fraud of his creditors, or subsequent purchasers, should or should not pass to the Sheriff, or assignee. That question was left to be decided, both as to real and personal property, as if the Statutes had simply provided, that all rights, interests and property of the debtor, should vest in the Sheriff, or assignees, for , the benefit of the creditors. As to the Act of 1769, and those subsequent, to the same effect, although they use the same expressions as to the interest of the debtor, which he could “lawfully depart withal,” in a somewhat different context, so as to be applicable to all the property, real and personal, (and if they had been originally used in that context, might have left it doubtful, whether the Legislature intended thereby to designate the debtor’s quantum of interest in the subject, or the quality of his interest in respect to his capacity to convey or transfer it,) yet I do not think the Legislature intended to use these expressions in the latter Laws, in any other sense than they were used in the former, the context being varied in the latter, only for the purpose, always attended to in our Revisáis, of condensing the Statutes into the shortest possible compass.
Upon the questions, whether property, fraudulently conveyed or transferred, and the conveyance or transfer void as to the creditors, by the 13th of Eliz. ch. 5, or as to purchasers, by the 27th of Eliz. (from which our Statute of Eraudsis in part complied,! vests in the assignees of a bankrupt, or not, I do not find any very satisfactory authority in the English Books. Those questions could only have arisen in the short interval between the 13th and 27th of Eliz. and the 1st of Jas. 1; for, at the latter period, a Statute passed, declaring that the making or causing to be made, a fraudulent grant or conveyance, was an act of bankruptcy; so that the title of the assignees overreached by relation, the fraudulent grant or conveyance, yet there might be cases of fraudulent transfers of property, to defraud creditors, which did not amount to an act of bankruptcy, as were all transfers of property, by any means other than by Deed, as by transfer of a Bill of Exchange; and in such cases, the assignees were held, from the time of Worseley v. De Mattos, 1 Burr. 467, to be entitled to the property so transferred, the transfer being void as to them, for the fraud. But, in all these cases, the fraudulent transfer was upon the eve of bankruptcy, and with an immediate view to it. Worseley v. De Mattos, 1 Burr. 467; Wilson v. Day, 2 Burr. 827; Hague v. Rolleston, 4 Burr. 2, 174; Alderson v. Tem-pie, 4 Burr. 2, 235; Linton v. Bartlet, 3 Wils. 47; Harman v. Fisher, Cowp. 117. The case, however, of Anderson v. Maltby, 2 Ves. jr. 244, was a case in which a father and two sons being in partnership, and their affairs in a critical situation, in 1784, one of the sons then retired from the partnership upon terms, as to the re-payment of his capital with profits, which were manifestly intended to secure the funds of the father and the other son, who continued the business, against their creditors subsequent to the time when the other son retired. Upon these principles, the accounts were settled in 178C, and the retired son received, at different times from 1784, up to 1788, when the firm failed, very large sums; and these transactions were set aside for fraud, and- the account directed to be settled upon just principles, upon a Bill filed by the assignees of the bankrupts, the Lord Chancellor declaring, that “assignees have all the equity the creditors have, and may impeach tranasctions, which the bankrupt himself would be stopped from impeaching.” In this case, too, the parties had their final bankruptcy in contemplation, when the impeached transactions took place. But, in all cases, fraudulent conveyances are made in fact, or are presumed in Law, from the circumstances, to be made in contemplation of insolvency, *and to defraud the creditors of the party. Upon the principles of these cases, I should think, that if the Statute of Jas. 1, had not been made, although a fraudulent conveyance in fraud of creditors, would not have been an'act of bankruptcy, yet it would have been void as to the creditors represented by the assignees, and the title would have vested in them, the commission of bankruptcy being considered to many purposes a Statutory Execution. Doe v. Rutledge, Cowp. 705. Lord Hardwicke, in Walker v. Burrows, 1 Atk. 93, seems to countenance this conclusion. TÍie Bill was filed by the assignees of the father, who became bankrupt in 1740, to set aside as fraudulent, a Deed made by him in 1718, it being a voluntary settlement after marriage, for the use of himself for life, for his wife for life, and then to his eldest son, &c. The questions were; first, whether it was void as to creditors under the 13th Eliz. ch. 5? Secondly, whether it was void as to subsequent purchasers under the 27th of Eliz.? And thirdly, whether the property passed to the assignees under the 1st of Jas. 1? Lord Hardwicke held, that it was not void as to creditors under the 13th of Eliz. because it did not appear that the father was indebted when he made the conveyance: that it was void, being voluntary, under the 27th of Eliz. against a purchaser for valuable consideration, but, that assignees of a bankrupt were not purchasers for valuable consideration, they standing in the place of the bankrupt, and bound by all acts fairly done by him, and that the title vested in the assignees by force of the Statute 1st Jas. 1, the conveyance not being made upon marriage, or upon valuable consideration. From this it appears, that this Deed, made twenty-two years before the bankruptcy, (if the father had been *899 proved to have been indebted at the time of the conveyance, so as to have made the Deed void as to creditors,) would have been void as to the assignees, and the property vested in them under the 113th of Eliz. not as subsequent purchasers, but as clothed with the rights of the creditors.
*If property transferred in fraud of creditors, vested in the assignees of a bankrupt by force of the Statutes of H. 8, and Eliz. of Bankrupts, it would vest in the Sheriff, under our Act for the relief of insolvent debtors, for the same reasons, upon the construction of the Statutes of England and our Acts, and upon the general principles of the Common Law applying to both cases.
A creditor, under whose Execution a debtor is taken and discharged, under our acts for the relief of insolvents, could never have had any further remedy upon his Judgment, except against the property of the debtor, acquired since his discharge, until by the Act of 1819, a Ca. Sa. was declared to bind all the debtor’s real property, (1 Rev. Co. p. 528, 1 10,) and by the Act of 1820, ch. 34, § 4, all his personal property. By force of these Acts, the creditor has a lien on all the property, real and personal, of his debtor, from the moment the Ca. Sa. is executed which he might enforce against property fraudulently conveyed, whether the property vested in the Sheriff or not. But before these Statutes passed, the creditor could have no remedy for recovering satisfaction out of property fraudulently conveyed, unless it vested in the Sheriff, for the satisfaction of the creditor’s demand.
And the passing of the Acts of 1819, and 1820, can have no effect upon the construction of the former Acts, which ought to have prevailed before those Acts were passed. The chief object of these Acts being to present a debtor whilst in custody, from disposing of his property in satisfaction of other debts, which he couid do before they were passed.
In this case, if it appeared to the satisfaction of the Jury, that the slave in question had always remained in the possession of Joshua Long, the gift to his daughter was void, whether made by parol, or by deed, and whether he was indebted at the time of the gift or not. If by parol, the gift was void as between the parties by the Act of October, 1787, ch. 22. (1 Rev. Co. p. 432, § 51,) or if by deed not recorded, it would be void, by the express provision of *our Statute of Frauds. 1 Rev. Co. ch. 101. And in either case, the property would vest in the Sheriff, and his Deed would pass the legal title to the purchaser, even if he violated the .terms or spirit of the Law, in respect to time, and manner of making the sale. The only question in this case is, whether the Deed does convey the identical property in question to Shirley.
The Judgment ought to be reversed, the verdict set aside, and a new trial awarded.
JUDGE CABELL dissented from so much of the opinions of his brother Judges, Carr, and Green, as gives any efficacy whatever, to a Sheriff’s sale, and conveyance of the property of an insolvent debtor, when that property was not in the possession of the Sheriff, and had not been claimed by him, “by legal process,” against those who were in possession thereof.